**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

| | | |
|---|---|---|
| **iLOR, LLC** | : | |
| | : | **CIVIL ACTION NO. 5:07-cv-00109-JMH** |
| **Plaintiff,** | : | **Chief Judge Joseph M. Hood** |
| | : | |
| **v.** | : | |
| | : | |
| **GOOGLE, INC.** | : | |
| | : | |
| **Defendant.** | : | |

**iLOR's MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR PRELIMINARY INJUNCTION**

Dockets.Justia.com

TABLE OF AUTHORITIES.......................................................................................................ii

I.      BACKGROUND.............................................................................................................1

II.     LEGAL FRAMEWORK .................................................................................................7

III.    ARGUMENT...................................................................................................................8

        A.      Plaintiff Can Demonstrate a Clear Showing of Reasonable Likelihood of Success
                on the Merits   ...............................................................................................................8

        B.      Movant Will Suffer Irreparable Harm Absent the Preliminary Injunction ...........31

        C.      The Balance of Hardships is Clearly in iLOR's Favor   ......................................35

        D.      The Public Has a Strong Interest in Enforcing Patent Rights ..............................36

IV.     CONCLUSION..............................................................................................................37

        CERTIFICATE OF SERVICE.....................................................................................38

## TABLE OF AUTHORITIES
## FEDERAL CASES

*Apex Inc., v. Raritan Computer, Inc.*, 325 F.3d 1364 (Fed. Cir. 2003) .......................... 10

*Byrne v. Black & Decker Corp.*, 2006 WL 1117685; 2006 U.S. Dist. LEXIS
24104 (E.D.KY, April 27, 2006) *aff'd, Byrne v. Black & Decker Corp.*, 2007
WL 492101 (Fed. Cir., May 21, 2007) ................................................................. 10

*DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293 (Fed. Cir. 2006) ........................... 28, 30

*Guttman, Inc. v. Kopykake Enters.*, 302 F.3d 1352 (Fed. Cir. 2002) ................................ 8

*Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446 (Fed. Cir. 1988) ......................... 8, 31, 35

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111
(Fed. Cir. 2004) ................................................................................................... 10

*Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317 (Fed. Cir. 2004) .................... 9

*Jacobson v. Cox Paving Co.*, 19 USPQ 2d 1641 (D. Ariz 1991) *aff'd* 949 F.2d
404 (Fed. Cir. 1991) ............................................................................................. 32

*Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999) ................... 9

*Lambton Mfg. v. Young*, 833 F. Supp. 610, 616 (W.D. Ky. 1993) ................................. 35

*Lopes v. Int'l Rubber Distributors, Inc.*, 309 F.Supp. 2d 972 (N.D.OH, February
5, 2004) ................................................................................................................ 10

*Manville Sales Corp. v. Paramount Systems, Inc.*, 917 F.2d 544 (Fed. Cir. 1990) ........ 30

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517
U.S. 370 (1996) .................................................................................................... 10

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369
(Fed. Cir. 2005) ............................................................................................... 30, 31

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 US 913 (2005) .................. 30

*Novo Nordisk of N.Am., Inc. v. Genentech, Inc.*, 77 F3d 1364 (Fed. Cir. 1996) .............. 8

*On Demand Machine Corp. v. Ingram Industries*, 442 F.3d 1331 (Fed. Cir. 2006)
*cert. denied On Demand Mach. Corp. v. Ingram Indus.*, 127 S. Ct. 683 (U.S.
2006) ..................................................................................................................... 18

*In re Paulsen*, 30 F.3d 1475 (Fed. Cir. 1994) ............................................................... 10

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,* 429 F.3d 1364, 1381 (Fed. Cir. 2005)  ....... 31, 36

*PHG Technologies, LLC v. Timemed Labeling Systems*, 2006 WL 2670967; 2006 U.S. Dist. LEXIS 66828 (M.D.TN, September 18, 2006) ..................................... 8, 9

*Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) ......................................... 10, 11

*Polymer Techs. v. Bridwell*, 103 F.3d 970 (Fed. Cir. 1996) ......................................... 8, 9

*Purdue Pharma L.P. v. Boehringer Ingelheim, GMBH*, 237 F.3d 1359 (Fed. Cir. 2001) ...................................................................................................................... 9

*Smith Int'l v. Hughes Tool Co.,* 718 F.2d 1573 (Fed. Cir. 1999) ...................................... 9

*Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660 (Fed. Cir. 1988) ..................... 30

## FEDERAL STATUTES

35 U.S.C. § 101 .............................................................................................................. 7
35 U.S.C. § 112 .............................................................................................................. 7
35 U.S.C. § 271(a) .......................................................................................................... 7
35 U.S.C. § 271(b) ..................................................................................................... 7, 27
35 U.S.C. § 283 .............................................................................................................. 7

## ADMINISTRATIVE GUIDELINES

Manual of Patent Examining Procedure, § 719 (USPTO, 8th Edition Revision 5, August 2006; accessed August 13, 2007)
http://www.uspto.gov/web/offices/pac/mpep/documents/0700_719.htm#sect7
19 ................................................................................................................................... 7

## DICTIONARIES

The American Heritage Dictionary of the English Language (http://www.bartleby.com/61/) (4th ed., Boston: Houghton Mifflin, 2000, accessed August 13, 2007) .................................................................................... 20

## EXHIBITS

A.    US Patent 7,206,839.

B.    WIKIPEDIA, *Social Software*, available at
http://en.wikipedia.org/wiki/Social_software (accessed August 24, 2007)

C.   Tim O'Reilly, *What Is Web 2.0 - Design Patterns and Business Models for the Next Generation of Software*, 9/30/2005, http://www.oreillynet.com/lpt/a/6228 (visited August 24, 2007).

D.   WIKIPEDIA, Danny Sullivan available at *http://en.wikipedia.org/wiki/Danny_Sullivan_(technologist)*) (accessed August 24, 2007).

E.   *About Search Engine Watch* - http://searchenginewatch.com/showPage.html?page=about (accessed August 24, 2007).

F.   About Incisive Media - http://www.incisivemedia.com/public/showPage.html?page=11338 (accessed August 24, 2007).

G.   Danny Sullivan, *iLOR Makes Google Even Better,* SEARCH ENGINE WATCH (April 19, 2001) available at http://searchenginewatch.com/2163651/print (accessed August 24, 2007).

H.   About MarketWatch available at http://www3.marketwatch.com/siteinfo/ (accessed August 24, 2007).

I.   Bambi Francisco, *Google Going Vertical*, MARKETWATCH (May 11, 2006) available at http://www.marketwatch.com/News/Story/Story.aspx?guid=%7B174948FE-E62F-40E5-846A-4C0948CC45B3%7D (accessed 8/24/2007).

J.   Answers.com, *beta: Definition and Much More from Answers.com*, June 7, 2004, available at http://www.answers.com/topic/beta-definition?cat=technology&print=true (accessed August 24, 2007).

K.   *Google Notebook FAQ* available at http://www.google.com/googlenotebook/faq.html (accessed August 24, 2007).

L.   *Google Notebook Tour* available at http://www.google.com/googlenotebook/tour1.html (accessed August 24, 2007).

**M.**   *Google Notebook from Google Labs,* (May 10, 2006) available at http://www.google.com/intl/en/press/pressrel/new_tech.html (accessed Auguat 24, 2007).

**N.**   Whatis.com, *Browser* (September 25, 2006) available at http://searchvb.techtarget.com/sDefinition/0,,sid8_gci211708,00.html (accessed August 24, 2007).

**O.**   Burt Helm, *Google's Desktop Offensive,* BUSINESS WEEK (May 11, 2006) available at http://www.businessweek.com/print/technology/content/may2006/tc200605 11_493243.htm (accessed August 24, 2007).

**P.**   *About the Motley Fool* available at http://www.fool.com/Server/printarticle.aspx&file=/press/about.htm (accessed August 24, 2007).

**Q.**   Rick Aristotle Munarriz, *Google's Sticky Little Fingers*, THE MOTLEY FOOL (May 11, 2006) available at http://www.fool.com/server/printarticle.aspx?file=/investing/value/2006/05/ 11/googles-sticky-little-fingers.aspx (accessed August 24, 2007).

**R.**   *Affidavit of Stephen Mansfield* (August 27, 2007).

**S.**   *5 Questions with PreFound.com CEO Steve Mansfield*, REPRISE MEDIA (May 24, 2006) available at http://www.searchviews.com/index.php/archives/2006/05/5-questions-with-prefoundcom-ceo-steve-mansfield.phpprint/ (accessed August 24, 2007).

**T.**   *About Reprise Media*, available at http://www.reprisemedia.com/about.aspx (accessed August 24, 2007).

**U.**   About Susan Kuchinskas, available at http://www.kuchinskas.com/aboutus.html (accessed August 24, 2007).

**V.**   *About Us [CMP],* available at http://www.cmp.com/about/index.jhtml (accessed August 24, 2007).

**W.**   Susan Kuchinskas, *Prefound on Competing with Google*, THE 360 (Oct. 27, 2006) available at http://360techblog.com/prefound-on-competing-with-google/2006/10/27/ (accessed August 24, 2007).

**X.** *Google Goes Multi-Lingual*, THE OFFICIAL GOOGLE BLOG (March 29, 2007) available at http://googleblog.blogspot.com/2007/03/google-notebook-goes-multi-lingual.html (accessed August 24, 2007).

**Y.** *Manual of Patent Examining Procedure* §719 (USPTO, 8th Edition Revision 5, August 2006) available at http://www.uspto.gov/web/offices/pac/mpep/documents/0700_719.htm#sect719 (accessed August 24, 2007).

**Z.** THE 360, *About the 360*, available at http://360techblog.com/about/ (accessed August 24, 2007).

**AA.** American Heritage Dictionary (2000) available at http://www.bartleby.com/61/26/A0542600.html (accessed August 24, 2007).

**BB.** WHATIS.COM, *URL*, November 27, 1999, http://web.archive.org/web/20000407183835/http://www.whatis.com/ (visited August 24, 2007).

**CC.** Office Action mailed January 28, 2004 (rejecting application 09/594,786).

**DD.** Response to January 28, 2004, Office Action regarding 09/594,786.

**EE.** US Patent 6,567,830.

**FF.** WHATIS.COM; *Plug-in* (May 12, 2003) available at http://searchsmb.techtarget.com/sDefinition/0,,sid44_gci212800,00.html (accessed August 24, 2007).

**GG.** WHATIS.COM, *Screen Shot* (July 31, 2001), available at http://whatis.techtarget.com/definition/0,,sid9_gci497372,00.html (accessed August 24, 2007).

**HH.** *Michael Kanellos Bio* available at http://www.idema.org/_smartsite/modules/news/show_news.php?cmd=display&news_id=1393 (accessed August 24, 2007).

**II.** Michael Kanellos, *The Scary Math Behind Web 2.0* (April 17, 2007) available at http://news.com.com/8301-10784_3-9710510-7.html?part=rss&subj=news&tag=2547-1_3-0-20 (accessed August 24, 2007).

**JJ.** Rich Mieslen, *The New York Times Newsroom Navigator,* NEW YORK TIMES (February 25, 2007) available at http://tech.nytimes.com/top/news/technology/cybertimesnavigator/index.html (accessed August 24, 2007).

**KK**. Search of the Google Blog for occurrences of the term "Google Notebook" from April 17, 2007 through August 17, 2007 at http://blogsearch.google.com/blogsearch?as_q=&num=10&hl=en&c2coff=1&as_oq =&as_eq=&lr=&safe=active&q=%22google+notebook%22&ie=UTF-8&as_mind=17&as_minm=4&as_miny=2007&as_maxd=17&as_maxm=8&as_max y=2007&as_drrb=b&ctz=240&c1cr=4%2F17%2F2007&c2cr=8%2F17%2F2007&b tnD=Go (accessed August 24, 2007).

**LL.** Tom Eid and Nikos Drakos, *The Emerging Enterprise Social Software Marketplace* (abstract) (July 23, 2007) (search for articles pertaining to social software in http://www.gartner.com/ (search run August 24, 2007).

**MM.** WIKIPEDIA, Gartner (August 3, 2007) available at http://en.wikipedia.org/wiki/Gartner (accessed August 24, 2007).

**NN.** The Kentucky Derby Roundtable (May 5-6, 2006) available at http://www.prefound.com/roundtable (accessed August 24, 2007).

**OO.** WIKIPEDIA, *InfoWorld* (April 30, 2007) available at http://en.wikipedia.org/wiki/InfoWorld (accessed August 24, 2007).

**PP.** Elizabeth Montalbano, *Prefound.com to Wed Social Networks, Search,* INFOWORLD (April 12, 2006) available at http://www.infoworld.com/archives/emailPrint.jsp?R=printThis&A=/article/ 06/04/12/77379_HNprefound_1.html (accessed August 24, 2007).

**QQ.** Nasdaq Summary Quotes, *Google,* August 24, 2007, http://quotes.nasdaq.com/asp/SummaryQuote.asp?symbol=GOOG&selected =GOOG (accessed August 24, 2007).

**RR.** Ari Levy, *Google Isn't Threatened by Slowdown, Economist Says (Update2)*, BLOOMBERG (August 24, 2007) available at http://www.bloomberg.com/apps/news?pid=conewsstory&refer=conews&tk r=GOOG:US&sid=awY5Vfh7.dXM (accessed August 27, 2007). ...........................

**SS.** WIKIPEDIA, *Bloomberg L.P.* (August 19, 2007) available at
http://en.wikipedia.org/wiki/Bloomberg_L.P. (accessed August 27, 2007).

**TT.** Paul R. LaMonica, *What Google should do with its $10 billion war chest,*
CNN MONEY (April 11, 2006) available at
http://money.cnn.com/2006/04/11/news/companies/google_cash/index.htm
(accessed August 27, 2007).

**UU.** WIKIPEDIA, *CNN* (August 23, 2007) available at
http://en.wikipedia.org/wiki/Cnn (accessed August 27, 2007).

## iLOR'S MEMORANDUM IN SUPPORT OF ITS
## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff requests that this Court preliminarily enjoin Google from using or inducing others to use the Google Notebook in a manner which infringes claim 26 of U.S. Patent 7,206,839. Accordingly, for its Motion for Preliminary Injunction pursuant to Fed.R.Civ.P. 65, the Plaintiff iLOR, LLC ("iLOR"), states as follows:

### I. Background

Since its founding in 2000, Plaintiff iLOR has been a technology innovator in the field of utilizing the Internet, particularly via hyperlinks.[1] Tools in this field will be critical to the larger picture of social software such as MySpace (http://www.myspace.com). Social software is a label which is generally applied to web-enabled software programs which allow users to interact, share, and/or meet with other users.[2] Social software is a key component of the even bigger picture of the Web 2.0 movement which rose from the ashes of the dot.com era.[3] Plaintiff applied for a patent for a social software tool as early as May 4, 2000, the filing date of the U.S. Provisional Application No. 60/202,029 from which the patent-in-suit claims priority.[4]

Early on, industry watchers recognized iLOR as a pioneer. "Check out the site. The features are useful, enough so that you'll probably wonder why they aren't available at Google

---

[1] "A hyperlink is simply a string of text or a computer graphic that a user can "click" with the mouse pointer, which will immediately load a new browser page that the hyperlink is programmed to present to the user." US Patent 7,206,839, Col. 1, ll. 24-28 (Exhibit A).

[2] WIKIPEDIA, *Social Software*, available at http://en.wikipedia.org/wiki/Social_software (accessed August 24, 2007) (Exhibit B).

[3] Tim O'Reilly, *What Is Web 2.0 - Design Patterns and Business Models for the Next Generation of Software* (9/30/2005) available at http://www.oreillynet.com/lpt/a/6228 (accessed August 24, 2007). [Tim O'Reilly is the founder and CEO of O'Reilly Media, Inc., a prolific publisher of computer books.] (*hereinafter, O'Reilly*) (Exhibit C).

[4] A provisional patent application is an abbreviated version of a full or non-provisional application which allows an inventor/applicant to secure a filing date for up to one year to determine whether or not they wish to commit the resources to file a non-provisional application. *See*, 35 U.S.C. 111(b).

itself." Danny Sullivan,[5] *iLOR Makes Google Even Better,* SEARCH ENGINE WATCH[6] (April 19,

2001) available at http://searchenginewatch.com/2163651/print (accessed August 24, 2007)

(Exhibit G).

But in 2006, MARKETWATCH[7] reported Google's interest in community-based searching,

an application of social software, in an interview with Eric Schmidt, CEO of Google. Bambi

Francisco, *Google Going Vertical,* MARKETWATCH (May 11, 2006) available at

http://www.marketwatch.com/News/Story/Story.aspx?guid=%7B174948FE-E62F-40E5-846A-

4C0948CC45B3%7D&print=true&dist=printTop (accessed 8/24/2007) (Exhibit I).

Google, now interested in the social software movement, launched a beta version[8] of a

product called the Google Notebook on May 15, 2006. Google Notebook provides a small

window, the "Google Mini-Notebook," in which users can exploit the Internet via hyperlinks.

Users may store information in the Google Mini-Notebook by clicking the right mouse button

while the cursor is positioned on a hyperlink on a webpage. The user may then select the "Note

this Item" option which will store a notebook entry relating to the currently viewed webpage. An

example of a Mini-Notebook with a notebook entry taken from a website maintained by Google

---

[5] Danny Sullivan is the founder of Search Engine Watch and a prolific writer and speaker in the field of internet search engines. *See*, WIKIPEDIA, *Danny Sullivan* available at
*http://en.wikipedia.org/wiki/Danny_Sullivan_(technologist)* (accessed August 24, 2007) (Exhibit D).
[6] "Search Engine Watch provides tips and information about searching the web, analysis of the search engine industry and help to site owners trying to improve their ability to be found in search engines."
http://searchenginewatch.com/showPage.html?page=about (accessed August 24, 2007). (Exhibit E). Search Engine Watch is currently owned by Incisive Media, a leading provider of business information to the UK personal finance industry. *See generally*, http://www.incisivemedia.com/public/showPage.html?page=11338 (accessed August 24, 2007) (Exhibit F).
[7] Marketwatch.com is operated by MarketWatch, Inc., a wholly-owned subsidiary of Dow Jones & Company. *See, About MarketWatch* available at http://www3.marketwatch.com/siteinfo/ (accessed August 24, 2007) (Exhibit H).
[8] A "beta" version of a program is a version of the program which is made available to specific users for testing purposes before the program's release. Answers.com, *beta: Definition and Much More from Answers.com,* June 7, 2004, available at http://www.answers.com/topic/beta-definition?cat=technology&print=true (accessed August 24, 2007) (Exhibit J).

is set forth as Figure 1 (below). The Mini-Notebook provides a user-friendly way to utilize the

Internet via hyperlinks because it allows users to save information regarding web pages they have

visited or wish to visit at a later date.[9]



**Figure 1. An exemplary Mini-Notebook.** [10]

The Google Notebook has been heavily promoted by Google and has received significant

media attention. Google featured the Google Notebook in its May 2006 press release:

> Google Notebook is a simple way for users to save and organize their thoughts
> when conducting research online. This personal browser[11] tool permits users to
> clip ... links from the pages they're browsing, save them to an online "notebook"
> ... and share them with others.
>
> *Google Notebook from Google Labs,* (May 10, 2006) available at
> http://www.google.com/intl/en/press/pressrel/new_tech.html (accessed August
> 24, 2007) (Exhibit M).

The press release noted how the tool fit into social software by encouraging the sharing of results

across a community of users. *Id.* The Google Notebook was also featured in BUSINESS WEEK[12]

---

[9] *Google Notebook FAQ* ¶ 1-3, 7 available at http://www.google.com/googlenotebook/faq.html (accessed August 24, 2007) (Exhibit K).

[10] *Google Notebook Tour* available at http://www.google.com/googlenotebook/tour1.html (accessed August 24, 2007) (Exhibit L).

[11] "A browser is an application program that provides a way to look at and interact with all the information on the World Wide Web." WHATIS.COM, *Browser* (September 25, 2006) available at http://searchvb.techtarget.com/sDefinition/0,,sid8_gci211708,00.html (accessed August 24, 2007) (Exhibit N).

[12] Burt Helm. *Google's Desktop Offensive,* BUSINESS WEEK (May 11. 2006) available at http://www.businessweek.com/print/technology/content/may2006/tc20060511_493243.htm) (accessed August 24, 2007) (Exhibit O).

and THE MOTLEY FOOL.[13] The latter article, which includes the Google Notebook, emphasized

Google's ability to use its size to compete even in areas where it was not the innovator. Rick

Aristotle Munarriz, *Google's Sticky Little Fingers*, THE MOTLEY FOOL (May 11, 2006) available

at http://www.fool.com/server/printarticle.aspx?file=/investing/value/2006/05/11/googles-sticky-

little-fingers.aspx ("Not all of the new offerings are unique to Google, but they all bear checking

out because **of the huge Internet audience that the search king commands**.") [emphasis

added] (accessed August 24, 2007) (Exhibit Q).

Following the beta release of Google Notebook and as the Google Notebook received

more publicity, iLOR's efforts were directed away from promoting its tools and significant time

was expended to assure the media that it was still viable even though Google was offering an

identical service. *Affidavit of Stephen Mansfield* at ¶ 8 (August 27, 2007) (Exhibit R). Google's

beta release devastated a planned media campaign in progress by iLOR which had been directed

at establishing iLOR's place as an industry leader. *Id.* The goal of iLOR's media campaign was

to establish enough momentum to achieve a self-sustaining critical mass of users. *Id.* Google

Notebook's entrance on the scene, however, forced iLOR to engage in damage control tactics in

the face of Google's overwhelming market power. *Id.*

MARKETWATCH, itself, on the heels of the Google Notebook launch, characterized

Google as the new giant in social search. *See, Google Going Vertical* (Exhibit I). ilOR

attempted to distinguish itself. *5 Questions with PreFound.com CEO Steve Mansfield*, REPRISE

MEDIA[14] (May 24, 2006) available at

---

[13] THE MOTLEY FOOL is a multimedia financial education company. Since 1996, in partnership with Simon and
Schuster, eight Motley Fool books have been published which have all climbed to *BUSINESSWEEK'S* best-seller list.
THE MOTLEY FOOL'S nationally syndicated weekly newspaper column debuted in 1997 and now appears in more
than 200 papers. *About the Motley Fool* available at
http://www.fool.com/Server/printarticle.aspx?file=/press/about.htm (accessed August 24, 2007) (Exhibit P).
[14] Reprise Media develops strategic, integrated search marketing campaigns that help the world's largest brands
generate revenue and drive traffic to their websites. The company has been recognized as a leader in the search

http://www.searchviews.com/index.php/archives/2006/05/5-questions-with-prefoundcom-ceo-steve-mansfield.phpprint/ (accessed August 24, 2007) (Exhibit S). But others questioned whether PreFound could even compete with Google. Influential bloggers asked "Now that Google, the 'web 2.0 startup killer', is moving into social search territory ... is it all over for startups like ... PreFound?" Susan Kuchinskas[15], *Prefound on Competing with Google*, THE 360[16] (Oct. 27, 2006) available at http://360techblog.com/prefound-on-competing-with-google/2006/10/27/ (accessed August 24, 2007) [Prefound.com is the website developed by the Plaintiff, iLOR] (Exhibit W).

Google continued to develop its Notebook and the product left beta phase on March 29, 2007. This was highlighted in the official Google Blog: "In case you haven't heard about it before, Google Notebook lets you conveniently collect, organize and share information while searching and browsing the web. If you've tried it already, I urge you to try again, as its new interface is much smoother to use than it was."[17]

In danger of losing its fragile foothold in the social search space, iLOR focused on prosecuting its pending patent application, covering its hyperlink technology, which issued as

marketing field by a broad range of independent parties including Forrester Research, Jupiter Research, OMMA Magazine and even Google. *See*, *About Reprise Media* available at http://www.reprisemedia.com/about.aspx (accessed August 24, 2007) (Exhibit T).

[15] Susan Kuchinskas is a former editor of THE 360. She has also co-authored *Going Mobile - Building the real-time enterprise with mobile applications that work,* and she has published two reports (*Profiting from Option Rich Networks* and *Getting in the Wireless Game: Opportunities and Entry Points*) for CMP Technology. CMP Technology is a part of United Business Media (www.unitedbusinessmedia.com), a leading global provider of news distribution and specialist information services for the professional and enthusiast markets, actively bringing buyers and sellers together across targeted media channels—publications, events and online. Ms' Kuchinskas work has also appeared in Technology Review, Wired, the Los Angeles Times and Business 2.0. *See, About Susan Kuchinskas,*, *http://www.kuchinskas.com/aboutus.html* (accessed August 24, 2007) (Exhibit U) and *About Us [CMP]*, http://www.cmp.com/about/index.jhtml (accessed August 24, 2007) (Exhibit V).

[16] THE 360 takes an analytical, in-depth look at the way that the Internet industry's largest players and most innovative newcomers are shaping the future. It tracks the technology, business models and interdependencies of the next generation of internet companies. *See*, THE 360, *About the 360*, http://360techblog.com/about/ (accessed August 24, 2007) (Exhibit Z).

[17] *Google Goes Multi-Lingual*, THE OFFICIAL GOOGLE BLOG (March 29, 2007) available at http://googleblog.blogspot.com/2007/03/google-notebook-goes-multi-lingual.html (accessed August 24, 2007) (Exhibit X).

U.S. Patent No. 7,206,839 on April 17, 2007 ("the '839 patent"). The '839 patent covers a novel and valuable method for enhancing a hyperlink that is currently being utilized in Google Notebook and by users of the Google Notebook.

This patent represents iLOR's only chance to exclude Google from continuing to unlawfully erode iLOR's market position. As is recognized by O'Reilly, "One of the key lessons of the Web 2.0 era is this: *Users add value.*" *See, O'Reilly* (Exhibit C). Without users, a social search site is virtually useless. *Affidavit at* ¶ 7 (Exhibit R). A small percentage of users will "go to the trouble of adding value" to a social site via explicit means (publishing their favourite links to the rest of the world). *See, O'Reilly* (Exhibit C). But the social site itself will also include means for "aggregating user data and building value as a side-effect of ordinary use of the application ... **the systems ... get better the more people use them.**" *Id.* [emphasis added]. In order for a social site that is dependent on users aggregating data to really become successful, it must offer users easily accessible online tools to assist them in aggregating the data. *Affidavit at* ¶ 7 (Exhibit R). Further, it is critical that the tools that are offered are so easy to use and helpful to these users that the tools become intrinsic to the browsing process itself for these users. *Id.*

But, given Google's almost instant name recognition compared to iLOR, Defendant will soon render iLOR a non-entity in social search through the presence of the Google Notebook, by luring users away from iLOR's website, unless iLOR can prevent Google from using its patented technology. If the infringement is stopped, then iLOR can engage in a marketing campaign to re-establish its position as an innovator for social search and attact users to its website. *Affidavit at* ¶ 9 (Exhibit R). This will, in turn, improve the overall operation of the website as noted by *O'Reilly*. However, if Defendant's infringement continues unabated, iLOR, whose user base has been usurped by Google, will soon be locked out of an entire market – a market in which it is an

innovator and patent holder. *Id* at ¶ 10. Therefore, iLOR seeks this preliminary injunction to stop Google's infringement of iLOR's patent.

## II.  Legal Framework

Plaintiff has sued Defendant for infringement of its '839 patent. A patent is the grant of a property right to the inventor, issued by the United States Patent and Trademark Office ("USPTO"). 35 U.S.C. § 101. Each patent includes one or more claims which particularly point out and claim the subject matter which the inventor regards as his invention, and a written description which sets forth how to make and use the claimed invention. 35 U.S.C. § 112. Together, the claims and written description are referred to as the patent's specification. *Id*. Before any patent is issued, it is rigorously examined by the USPTO to ensure that patents are only granted for inventions which are new, useful, and unobvious. The record of communications between the patent office and the inventor during examination is called the patent's "prosecution history" or "file wrapper". *See generally*, *Manual of Patent Examining Procedure* §719 (USPTO, 8th Edition Revision 5, August 2006) available at http://www.uspto.gov/web/offices/pac/mpep/documents/0700_719.htm#sect719 (accessed August 24, 2007) (Exhibit Y). Once a patent has been granted, whoever uses the patented invention without the permission of the patent holder is liable as an infringer. 35 U.S.C. §271(a). Further, anyone who actively induces infringement is also liable as an infringer. 35 U.S.C. § 271(b).

The Patent Act authorizes courts "[t]o grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. The grant or denial of an injunction is an act of equitable

discretion by the district court. *Guttman, Inc. v. Kopykake Enters.*, 302 F.3d 1352, 1356 (Fed.

Cir. 2002) citing *Novo Nordisk of N. Am., Inc. v. Genentech, Inc.,* 77 F.3d 1364, 1367 (Fed. Cir.

1996). As the moving party, iLOR must establish its right to a preliminary injunction in light of

a clear showing of four factors:

> (1) the movant has sufficiently established a reasonable likelihood
> of success on the merits; (2) immediate irreparable harm will result
> if the relief is not granted; (3) the balance of hardships to the
> parties weighs in the movant's favor; and (4) the public interest is
> best served by granting the injunctive relief.

*Polymer Techs., Inc. v. Bridwell,* 103 F.3d 970, 973 (Fed. Cir. 1996) followed by *PHG*

*Technologies, LLC v. Timemed Labeling Systems,* 2006 WL 2670967; 2006 U.S. Dist. LEXIS

66828 (M.D.TN. 2006). *See also, Atlas Powder Co. v. Ireco Chemicals,* 773 F.2d 1230 (Fed.

Cir. 1985) and *also, J-Star Industries, Inc. v. Oakley,* 720 F.Supp 1291, 1295 (W.D. Mich. 1989)

[standard for review is a clear showing]. "These factors, taken individually, are not dispositive;

rather, the district court must weigh and measure each factor against the other factors and against

the form and magnitude of the relief requested." *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446,

1451 (Fed. Cir. 1988).

## III. Argument

As discussed below, iLOR can establish its right to a preliminary injunction in light of the

four factors set forth above.

## A. Plaintiff Can Demonstrate a Clear Showing of Reasonable Likelihood of Success on the Merits

To obtain a preliminary injunction, the movant must establish a clear showing of, at least,

a "reasonable likelihood of success on the merits." *Polymer*, 103 F.3d at 973 *citing Hybritech,*

849 F.2d at 1451, *and followed by PHG Techs.*, 2006 WL 2670967 at 8; 2006 U.S. Dist. LEXIS
66828 at 25-26. Likelihood of success on the merits is established by demonstrating that a
patent is likely valid and has been infringed. *Polymer,* 103 F.3d at 973, citing *Smith Int'l. v.
Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir.), *cert. denied,* 464 U.S. 996 (1983). Only one
claim need be infringed to prove infringement of a patent. *Johnson Worldwide Assocs. v. Zebco
Corp., 1*75 F.3d 985, 988 (Fed. Cir. 1999). For purposes of the present motion, as set forth
below, iLOR can demonstrate that claim 26 of the '839 Patent is valid and has been infringed.

### 1. The '839 Patent is Clearly Valid

Patents are entitled to a statutory presumption of validity, and a challenger to the validity
of a patent must demonstrate invalidity by clear and convincing evidence. 35 U.S.C. § 282.
While iLOR bears the burden of proof for establishing a likelihood of success on the merits, if
Defendant does not provide any persuasive evidence of invalidity, then "the very existence of the
patent satisfies...[the Plaintiff's] burden on validity." *Purdue Pharma L.P. v. Boehringer
Ingelheim, GMBH,* 237 F.3d 1359, 1365-66 (Fed. Cir. 2001) *rehearing en banc denied by Purdue
Pharma L.P. v. Boehringer Ingelheim GMBH,* 237 F.3d 1359 (Fed. Cir. 2001). *See also*, *Iron
Grip Barbell Co. v. USA Sports, Inc.,* 392 F.3d 1317, 1340 (Fed. Cir . 2004). In this case, in light
of the extremely thorough review, at the USPTO, of the '839 patent and applications related to
the '839 patent, Defendant will not be able to provide persuasive evidence of invalidity.
Therefore, in view of the presumption of validity of the '839 patent, iLOR has clearly satisfied
the validity prong of the "reasonable likelihood of success" test.

## 2. Claim 26 of the '839 Patent is Clearly Infringed

The assessment of the likelihood of infringement of a valid patent for purposes of a preliminary injunction, like a determination of patent infringement at a later stage of litigation, requires a two-step analysis. *Lopes v. Int'l. Rubber Distributors, Inc.,* 309 F.Supp. 2d 972, 979 (N.D.Ohio. 2004) *citing Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970-71 (Fed. Cir. 1995), *aff'd,* 517 U.S. 370 (1996). First, the Court determines, as a matter of law, the correct meaning and scope of the asserted claims. *Markman,* 52 F.3d at 970-71. Then, the Court compares the properly construed claims to the accused device or method to determine, as a matter of fact, whether all of the limitations of at least one claim are present. *Byrne v. Black & Decker Corp.,* 2006 WL 1117685 at *3, 2006 U.S. Dist. LEXIS 24104 at *8 (E.D. KY. 2006) *aff'd* 2007 WL 1492101; 2007 U.S. App. LEXIS 12000 (Fed. Cir. 2007).

In construing claims, there is a "strong presumption that claim terms carry their ordinary meaning as viewed by one of ordinary skill in the art." *Apex Inc. v. Raritan Computer, Inc.,* 325 F.3d 1364, 1371 (Fed. Cir. 2003). However, "[p]roperly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005). When determining the ordinary meaning of claim language, resort may be had to sources including "the words of the claims themselves, the remainder of the specification, the prosecution history, extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips,* 415 F.3d at 1314 *citing Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,* 381 F.3d 1111 (Fed. Cir. 2004). An applicant is also entitled to rebut the presumption that claim terms are to be given their ordinary and customary meaning by clearly setting forth a definition of the term that is different from its ordinary and customary meaning(s). *In re Paulsen,* 30 F.3d 1475, 1480 (Fed.

Cir. 1994). Finally, "[d]ictionaries or comparable sources are often useful to assist in

understanding the commonly understood meaning of words." *Phillips*, 415 F.3d at 1322.

The following sections provide the Court with the correct meaning and scope of claim 26

of the '839 patent and then compare that claim to the acts performed in the downloading and use

of the Google Notebook to show that Google and its users are liable for infringing that claim.

### a. Claim Construction

Claim 26 of the '839 Patent is directed to a method for enhancing a hyperlink.

> 26. A method for enhancing a hyperlink, comprising providing a user-
> selectable link enhancement for a toolbar, the toolbar being displayable
> based on a location of a cursor in relation to a hyperlink in a first page in a
> first window of an application, wherein said first page is associated with a
> first uniform resource locator (URL), wherein said hyperlink is associated
> with a second URL and a second page, wherein said user-selectable link
> enhancement is adapted to display a graphical element based on said first
> URL; receiving an indication of a first user selection of said link
> enhancement; and as a result of said first user selection, capturing said
> first URL associated with said first page; and displaying a graphical
> element, said graphical element associated with said captured first URL,
> said graphical element adapted to cause said first page to be displayed as a
> result of a second user selection of said graphical element.

Each claim limitation will be defined and applied to the Google Notebook.

### i. Providing a user-selectable link enhancement for a toolbar

In the '839 patent, "providing a user-selectable link enhancement for a toolbar" means

making available a function in a toolbar, for example, an option inserted into the toolbar, which

enhances a hyperlink by making it possible to do something with that hyperlink other than

clicking to move to a new page. This interpretation is supported by both the specification of the

'839 patent, and the dictionary definitions of the claim terms. Regarding the specification, the

'839 patent makes clear that the invention is intended to allow the user to perform additional

interactions with a hyperlink. For example, the '839 patent states that "there is a need for an

improved hyperlink that provides the user with the ability to do more with a hyperlink than click

to move to a new page. The present invention solves this problem by providing an enhanced hyperlink that provides the user the ability to choose additional interactions with the hyperlink [beyond clicking and moving to a new page]." '839 Patent at col. 2, ll. 21-29.

The '839 patent specification also provides multiple examples of enhancements such as "check out later" and "anchor," among others. '839 patent, col. 4, ll. 10-55. Consistent with the interpretation provided above, each of those enhancements provides the user with the ability to do more with a hyperlink than click to move to a new page.

The specification also explicitly defines a "toolbar," and provides examples of using a link enhancement with a toolbar which are consistent with the interpretation provided above. In the '839 patent, a "toolbar" is defined as "any graphic user interface presented to users as part of an Enhanced Hyperlink." '839 patent col. 3, ll. 25-26. With relation to link enhancements, toolbars are disclosed which display options that are selected to utilize link enhancements. *E.g.*, '839 patent, col. 5, ll. 46-47 ("With the tool bar displayed, the user may select which link enhancement they desire to utilize, if any."); col. 8, ll. 20-22 ("The toolbar provides one method for the user to select the particular link enhancement that the user desires to utilize."). This indicates that a link enhancement "for a toolbar" is one which is represented by an option inserted into the toolbar.

Accordingly, "providing a user-selectable link enhancement for a toolbar" should be understood to refer to making available a function in a toolbar, for example, an option inserted into the toolbar, which enhances a hyperlink by making it possible to do something with that hyperlink other than clicking to move to a new page.

### ii. The toolbar being displayable based on a location of a cursor in relation to a hyperlink in a first page in a first window of an application.

As used in the '839 patent, this phrase means that the toolbar containing the link enhancement, as defined above, can become visible when the cursor is positioned in a certain area in relation to the hyperlink.

This interpretation is clearly supported by the '839 patent's specification. As a concrete example of this, consider figure 2 of the '839 patent, reproduced below for the sake of convenience. "FIG. 2 [of the '839 patent] illustrates a sample toolbar that may be displayed by the invention of FIG. 1." Col. 3, ll. 3-4. Figure 1 illustrates an exemplary flow chart in which a user selects a hyperlink "by moving a cursor either 'over' or near a hyperlink that the user wishes to select." Col. 5, ll. 36-38. Once the hyperlink is selected "the program displays a toolbar which illustrates the link enhancements available for that particular hyperlink." Col. 5, ll. 38-40.



**Figure 2: Copy of Figure 2 of the '839 Patent.**

As shown in figure 2, the link enhancements shown might include "contact me later," "send reminder," or "check out later." Thus, the specification of the '839 patent supports the

construction that "the toolbar being displayable based on location of a cursor in relation to a

hyperlink" means that the toolbar, containing the link enhancement, can become visible when the

cursor is positioned in a certain area in relation to the hyperlink.

### iii. Wherein said first page is associated with a first uniform resource locator (URL); wherein said hyperlink is associated with a second URL and a second page

This phrase should be interpreted to mean that the web page where the hyperlink appears

has a first URL, and that the hyperlink is programmed to present a second page having a second

URL to the user.

The claim term "page" is explicitly defined as "any web page, electronic document, file,

screen display, or other location a user may access with a hyperlink." '839 patent at col. 3, ll. 29-

30. Referring to a technical dictionary, the term "URL" should be understood to refer to the

location of an Internet resource, for instance, the address of a web page. *See*, WHATIS.COM, *URL*,

(November 27, 1999) available at

http://web.archive.org/web/20000407183835/http://www.whatis.com/ (visited August 24, 2007)

(Exhibit BB).

Accordingly, this phrase should be construed to mean that the web page where the

hyperlink appears has a first URL, and that the hyperlink is programmed to present a second page

having a second URL to the user.

### iv. Wherein said user-selectable link enhancement is adapted to display a graphical element based on said first URL

As set forth below, this phrase should be construed to mean that the link enhancement is

designed to display an element that includes some graphics attribute and that the element is based

on the first URL. The term "first URL" is construed in Section III.A.2.a.iii, *supra*, to be the URL

of the first page. "Graphical element" means an element that includes some graphics attribute; that is, it is not purely textual.

The best indication of the meaning of the term "graphical element" as used in claim 26 comes from the language used in patents which are related to the '839 patent, and from the arguments made while those patents were being examined by the Patent Office. For example, the examiner assigned to related U.S. Patent No. 6,925,496 ('496 patent) explained, in a rejection mailed on January 28, 2004, that a prior art reference taught "displaying pending links and some associated graphical elements such as colors." Office Action at 3 (January 28, 2004) (rejecting application 09/594,786) (Exhibit CC). Thus, a "graphical element" should be construed in a manner which includes colors.

Also, statements made during examination of related patents help define the term "graphical element" by providing examples of what does not fall within the scope of a "graphical element." For example, the Patent Office rejected a claim which included the phrase "copying any associated graphical elements corresponding to the hyperlink." *Id.* In the Applicant's response, it was explained "As taught by Newfield - the associated graphical element corresponding to the hyperlink is not copied to the second window." *See,* Response at 5 (to January 28, 2004, Office Action regarding 09/594,786) ("Exhibit DD"). Thus, because simply copying text, without any formatting elements (e.g., color), does not constitute copying a graphical element, a graphical element should be defined in a manner which excludes a bare unformatted text string. In other words, the claim uses the term "graphical element," not merely "graphics." In any event, unformatted text is not "graphics."

Finally, this construction is further supported by resort to extrinsic evidence, that is, the way other inventors used the term "graphical element" around the time the '839 patent was originally filed. For instance, in a patent issued to International Business Machines (IBM), a